UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARCY HARPER, | 1:18-cv-00562-LJO-SKO |
| Plaintiff, | MEMORANDUM DECISION AND ORDER RE DEFENDANTS' MOTIONS TO DISMISS |
| v. | |
| COUNTY OF MERCED, et al., | (Docs. 11, 14) |
| Defendants. | |

## I. <u>INTRODUCTION</u>

Plaintiff Darcy Harper filed a complaint in April 2018 against the County of Merced ("County"), the City of Merced ("City"), Merced Police Officer Nathaniel McKinnon, and DOE Sheriff's Deputies and DOE Merced Police Officers. The City and County Defendants filed motions to dismiss, which Plaintiff opposes. For the reasons set forth below, Defendants' motions to dismiss are DENIED in part, and GRANTED in part.

## II. <u>FACTUAL BACKGROUND</u>

Plaintiff suffers from mental health disorders, including schizophrenia and bipolar disorder. On June 5, 2014, while Plaintiff was not taking his medications, he began exhibiting signs of depression and experiencing suicidal thoughts. Due to his behavior, Plaintiff's sister brought him to Marie Green, a mental health facility located in Merced. Later that same day, Plaintiff was brought to Mercy Hospital and placed under a "mental-health hold." During his hospitalization, on June 6, 2014, at approximately 4:30 a.m., Plaintiff suffered a "psychotic break" and determined he did not wish to be

1

confined at the hospital; Plaintiff, who is 5'1 tall and weighs 110 pounds, fled the hospital on foot, running in the direction of the University of California, Merced campus ("UCM"). Defendant police officer McKinnon, having full knowledge of Plaintiff's mental illnesses, was dispatched to the area to capture Plaintiff. Officer McKinnon observed Plaintiff running toward UCM wearing only his yellow hospital gown and carrying a four-foot wooden post. Officer McKinnon got out of his patrol car and began to chase Plaintiff on foot; while he was fleeing, Plaintiff threw down the wooden post, continued to run, and scaled an 11-foot fence entering the "stadium section" of UCM's campus. By this time, other police units had arrived at the area and set up a perimeter to ensure that Plaintiff did not escape. When Officer McKinnon entered the stadium searching for Plaintiff, he observed Plaintiff had removed his hospital gown and was wearing only boxer shorts.

After Officer McKinnon illuminated Plaintiff with his flashlight, Plaintiff rolled down an embankment to a handicapped ramp below; Officer McKinnon pursued Plaintiff. During the chase, Plaintiff ran up a "40-foot elevation embankment" with his back to Officer McKinnon, who deployed his taser in dart mode, which caused Plaintiff to drop to the ground, hitting his head. After being hit with the taser dart, falling, and hitting his head, Plaintiff got up and began running again. When Plaintiff stopped running due to fatigue, Officer McKinnon again deployed his taser in dart mode and shot Plaintiff in his chest area, causing Plaintiff to fall to the ground again. While Plaintiff pulled the dart barb from his skin, Officer McKinnon approached Plaintiff to tase him a third time. Plaintiff attempted to push Officer McKinnon's hand carrying the taser away from his body, at which time McKinnon executed a knee strike to the side of Plaintiff's head. The strike caused Plaintiff to roll down a hill; Officer McKinnon pursued him down the hill and executed another knee strike to Plaintiff's rib-cage area. Plaintiff was arrested and charged with assault with a deadly weapon other than a firearm, and was placed in Merced County Jail. Plaintiff was placed in a cell with a sexually violent inmate who raped Plaintiff; the other inmate was removed and an investigation ensued, but the sexually violent inmate was ultimately returned to the cell with Plaintiff. The criminal case against Plaintiff was

dismissed in May 2016.

On April 25, 2018, Plaintiff filed this lawsuit alleging an excessive force claim against Officer McKinnon and Doe Police Officers, as well as a *Monell* claim against the City of Merced for failure to adequately train its officers and for having a longstanding custom and practice of "not carefully handling mentally ill individuals" (Cmplt., ¶¶ 40-44); Plaintiff alleged a claim under the Americans with Disabilities Act of 1990 ("ADA") against both the County and City of Merced for failure to provide reasonable accommodation (Cmplt., ¶¶ 45-55); and Plaintiff alleged a claim against Merced County Sheriff's Deputies under the Fourteenth Amendment for placing Plaintiff in a cell with a sexually violent inmate who harmed Plaintiff, along with a *Monell* claim against the County of Merced stemming from the same conduct and injuries due to the County's alleged failure to train its deputies and for maintaining a longstanding custom and practice of "not carefully handling mentally ill individuals in their custody" (Cmplt., ¶¶ 65, 66).

## III. <u>ANALYSIS</u>

### A. <u>Legal Standard</u>

A motion to dismiss pursuant to Rule 12(b)(6) is a challenge to the sufficiency of the allegations set forth in the complaint. Dismissal under Rule 12(b)(6) is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balisteri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1990). In considering a motion to dismiss for failure to state a claim, the court generally accepts as true the allegations in the complaint, construes the pleading in the light most favorable to the party opposing the motion, and resolves all doubts in the pleader's favor. *Lazy Y. Ranch LTD v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

To survive a 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at 556). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions." *Twombly*, 550 U.S. at 555 (internal citations omitted). Thus, "bare assertions . . . amount[ing] to nothing more than a 'formulaic recitation of the elements'. . . are not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. "[T]o be entitled to the presumption of truth, allegations in a complaint . . . must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). In practice, "a complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562. To the extent that the pleadings can be cured by the allegation of additional facts, a plaintiff should be afforded leave to amend. *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv., Inc*., 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

**B.**   **Statute of Limitations**

All City and County Defendants contend that Plaintiff's claims are barred by the applicable statutes of limitations. Specifically, Plaintiff's claims under Section 1983 are subject to a two-year statute of limitations, *Wallace v. Kato*, 549 U.S. 384, 387 (2007) (state statute of limitations for personal injury claims applies to Section 1983 claims); Cal. Code Civ. Proc. § 335.1 (personal injury actions in California are subject to two-year statute of limitations), and Plaintiff's ADA claims are subject to a three-year statute of limitations, *Sharkey v. O'Neal*, 778 F.3d 767, 772 (9th Cir. 2015) (Cal. Gov. Code § 11135 applies to ADA claims and mandates a three-year time limitation for filing). Defendants argue that since the events described in Plaintiff's complaint occurred in June 2014, and the complaint was not filed until April 2018, the claims are barred as untimely. City and County

Defendants also argue Plaintiff's claims are not subject to tolling under California Code of Civil Procedure § 352(a), which tolls any applicable statutes of limitations during a period when a plaintiff lacks legal mental capacity.

Plaintiff does not dispute the statute of limitations apply to his claims, but he argues his claims were tolled by California Government Code § 945.3 while criminal charges were pending against him. Under Section 945.3, criminal charges are considered "pending" until the date of judgment. *McAlpine v. Super. Court*, 209 Cal. App. 3d 1, 3 (1989). Plaintiff notes the criminal proceedings against him arising out of this incident continued for approximately two years and were dismissed in May 2016 due to Plaintiff's mental incompetency; at that time, he was placed by the court under the conservatorship of his mother.

California Government Code § 945.3 provides as follows:

No person charged by indictment, information, complaint, or other accusatory pleading charging a criminal offense may bring a civil action for money or damages against a peace officer or the public entity employing a peace officer based upon conduct of the peace officer relating to the offense for which the accused is charged, including an act or omission in investigating or reporting the offense or arresting or detaining the accused, while the charges against the accused are pending before a superior court.

Any applicable statute of limitations for filing and prosecuting these actions shall be tolled during the period that the charges are pending before a justice, municipal, or superior court.

Although the Ninth Circuit refuses to allow Section 945.3 to bar a potential plaintiff from bringing a Section 1983 claim while related criminal actions are pending, it has held the Section 945.3 tolling provision "still appl[ies] to toll the limitations period while criminal actions are pending against the potential plaintiff." *Harding v. Galceran*, 889 F.2d 906, 907-08 (9th Cir. 1989). County Defendants argue the purpose of the statute – to prevent criminal defendants from gaining leverage in criminal plea bargaining – has no bearing here because the public employees being sued are "unrelated" to the prosecution of the offenses for which Plaintiff was charged. The County does not expound on what the criminal charges against Plaintiff specifically included or why the claims pertaining to his

detention would not implicate the policy considerations underpinning Section 945.3. Plaintiff alleges that he was arrested and charged criminally based on his flight and interaction with police officers in June 2014.[1] (Cmplt., ¶ 28.) His detention allegedly arose based on those charges, and there are no facts showing the criminal charges were filed by an entity that had no relation to the entity that detained Plaintiff, here the Merced County jail, such that the public policy behind Section 945.3 would not be implicated. Based on the facts alleged, Section 945.3 plausibly applies to toll Plaintiff's claims until May 2016, when the criminal charges against Plaintiff were dismissed. (Cmplt., ¶ 33.) Pursuant to this tolling, Plaintiff's complaint, filed in April 2018, was within both the 2-year statute of limitation applicable to Section 1983 claims in California and the 3-year statute of limitation for ADA claims in California.[2]

The parties also dispute whether Plaintiff's claims can be tolled pursuant to California Code of Civil Procedure § 352(a), which provides that claims of those who lack legal capacity are tolled during the time of incapacity. Cal. Code Civ. Proc. § 352(a).[3] Defendants maintain Plaintiff does not lack legal capacity in the manner described by Section 352(a) and thus the statute is not applicable to him;[4] Plaintiff argues he lacked legal mental capacity at the time his claims accrued and since then such that Section 352(a) has tolled the period for filing his claims.

For purposes of mental incapacity, Section 352(a) applies when, at the time a cause of action

---

[1] Other than what is alleged generally by Plaintiff, the Court has no information about the nature of the criminal charges against Plaintiff.

[2] If there are facts showing the criminal charges against Plaintiff had no relation to his arrest and detention on June 5, 2014, as County Defendants maintain, and that Section 945.3 is not applicable as a result, Defendants are not precluded from raising their statute of limitations defense again.

[3] Cal. Code Civ. Proc. § 352(a) was amended as of January 1, 2015.

[4] County Defendants request the Court take judicial notice of the following documents: Letters of Conservatorship, Minute Order, and Offer of Third Party Assistance. The Letters of Conservatorship requested appointment of Donna Taylor as Darcy Harper's conservator on November 4, 2010. (Doc. 19, p. 5.) The second document is an LPS Conservatorship/Mental Health Minute Order indicating that the petition was dismissed as the "conservatee's mother, Tonya Fay Turner, has offered to assist [Plaintiff]." (Doc. 19, p. 6.) The third document is an "Offer of Third Party Assistance" signed by Tonya Fay Harper indicating she would provide for Plaintiff's basic personal needs of food clothing and shelter. These documents were filed in the Fresno County Superior Court and are a matter of public record. The Court takes judicial notice of the existence of these documents. *Lee v. City of L.A.*, 250 F.3d 668, 689-90 (9th Cir. 2001).

accrued, the plaintiff is incapable of caring for his own property or transacting business or understanding the nature or effects of his acts. *Alcott Rehab. Hosp. v. Superior Court*, 93 Cal. App. 4th 94, 101 (2001). Even a person who is considered mentally ill for commitment purposes may nevertheless be capable of transacting business and carrying out his or her affairs, either during occasional lucid intervals or throughout hospitalization. *Hsu v. Mt. Zion Hosp.*, 259 Cal. App. 2d 562, 573-74 (1968). At the pleading stage, a district court may dismiss a claim only if the assertions of the complaint, read with the required liberality, would not permit a plaintiff to prove that the applicable statute of limitations was tolled. *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1045 (9th Cir. 2011). Plaintiff has alleged no facts that could establish Section 352(a) applies to toll his claims other than to allege that he was diagnosed with mental health disorders at the time his claims accrued. There are no facts showing how these diagnoses precluded plaintiff from caring for property or transacting business or understanding the nature of his acts; there are also no facts alleging how long he was precluded from any such activities. To the extent Plaintiff wishes to rely on this tolling provision, his complaint is insufficiently pled to show that he lacked legal capacity or was "insane" for purposes of Section 352(a).

## C. *Monell* Claims

Plaintiff alleges claims against the City and County under *Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 658 (1978), where the Supreme Court held that governmental units could be liable under 42 U.S.C. § 1983 when a constitutional violation arises from a governmental custom or official policy. Pursuant to 42 U.S.C. § 1983, "[e]very person who, under color of any statute . . . custom, or usage of any State . . . subjects, or causes to be subject, any . . . person within the jurisdiction of [the United States] to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law."

To sufficiently state a *Monell* claim against a local governmental entity and withstand a Rule 12(b)(6) motion to dismiss, allegations in a complaint "may not simply recite the elements of a cause of

action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *AE ex rel. Hernandez v. County of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012). The factual allegations taken as true "must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Id.* There are three different potential theories of municipal liability under *Monell*: (1) when official policies or established customs inflict a constitutional injury; (2) when omissions or failures to act – including the failure to train – amount to a local government policy of deliberate indifference to constitutional rights; or (3) when a local governmental official with final policy-making authority ratifies a subordinate's unconstitutional conduct. *Thomas v. County of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014).

### 1.    Policy, Practice, or Custom Causing Injury

Plaintiff alleges the City and County maintained a policy and practice of "not carefully handling mentally ill individuals" that amounted to violation of Plaintiff's constitutional rights.

To establish municipality liability under *Monell* for a longstanding practice or custom, a plaintiff must show (1) the plaintiff "possessed a constitutional right of which [he or she] was deprived"; (2) the municipality had a policy, practice, or custom; (3) that this policy, practice, or custom amounts to deliberate indifference to the plaintiff's constitutional right; and (4) the policy, practice, or custom is the moving force behind the constitutional violation. *Plumeau v. Sch. Dist. No. 40 County of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997). An unwritten policy or custom must be so "persistent and widespread" that it constitutes a "permanent and well settled" practice. *Monell*, 436 U.S. at 691. "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). In pleading such a claim, the complaint must "put forth additional facts regarding the specific nature of [the] alleged policy, custom, or practice." *AE*, 666 F.3d at 637.

8

Plaintiff's complaint falls short of pleading a cognizable custom or practice *Monell* claim against either the City or County. As to the alleged excessive use of force during Plaintiff's arrest and the alleged assault Plaintiff suffered during detention, the complaint alleges only that the City and County have a "widespread or longstanding custom and practice of not carefully handling mentally ill individuals" and that this custom or practice amounts to deliberate indifference. (Cmplt., ¶¶ 41, 66.) This type of boilerplate allegation does not contain any factual assertion specific to explain what a custom or practice of "not carefully handling" mentally ill individuals means in a practical and factual sense. There are also no factual allegations showing how "not carefully handling" Plaintiff was the moving force in the deprivation of his constitutional rights. And, even assuming the complaint contained an adequate factual characterization of what "not carefully handling" mentally ill individuals means in the context of both Plaintiff's arrest and detention, there are also no facts showing this practice was of sufficient duration, frequency, and consistency such that the alleged custom or practice has become a traditional method of carrying out policy. *Trevino*, 99 F.3d at 918 (liability cannot be predicated on isolated or sporadic events). The custom and practice *Monell* claims against City and County Defendants are DISMISSED with leave to amend.

## 2. <u>Failure to Train</u>

Plaintiff alleges the City violated his constitutional rights based on Officer McKinnon's alleged excessive use of force in arresting Plaintiff. Plaintiff further alleges the County violated his constitutional rights by placing him in a holding cell where he was sexually assaulted by a cell mate who was known by County deputies to be sexually violent. Plaintiff alleges these constitutional violations were caused by the City and County's respective failures to train their officers and deputies regarding "the handling of people who are suffering from mental illness."

To state a claim for failure to train under *Monell*, a plaintiff must show (1) the existing training program is inadequate in relation to the tasks the particular officers must perform; (2) the officials have been deliberately indifferent to the rights of persons with whom the police come into contact; and (3)

9

the inadequacy of the training "actually caused the deprivation of the alleged constitutional right. *Merritt v. County of L.A.*, 875 F.2d 765, 770 (9th Cir. 1989).

Like the policy and custom allegations, Plaintiff's failure-to-train theory is bereft of any factual allegations sufficient to state a claim.  There is only a single allegation that the County and City Defendants do "not train, or inadequately train[ their] officers regarding the handling of people who are suffering from mental illness, so as not to cause these individuals to become injured."  (Cmplt., ¶¶ 40, 65.)  This is inadequate to state a claim.  Failure-to-train allegations must demonstrate deliberate indifference:  there must be a showing of a "conscious or deliberate choice on the part of the municipality." *Price v. Sery*, 513 F.3d 962, 973 (9th Cir. 2008).  Moreover, a "pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train," but here there are no facts showing any type of pattern of similar violations. *Flores v. County of L.A.*, 758 F.3d 1154, 1159 (9th Cir. 2014).[5]  Isolated incidents of alleged wrongdoing do not suffice to put the City or County on notice that their courses of training are deficient in some respect.  Plaintiff's failure-to-train *Monell* claims are DISMISSED with leave to amend.

**D.  <u>Plaintiff's ADA Claims</u>**

Plaintiff alleges claims under Title II of the ADA against City and County Defendants due to

---

[5] In *City of Canton v. Harris*, 489 U.S. 378, 390 (1989), the Supreme Court articulated an exception to the rule requiring a pattern of similar violations by untrained employees. In *Canton*, the "Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force." *Connick v. Thompson*, 563 U.S. 51, 63 (2011) (reviewing *Canton*). In this hypothetical, the Court "sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id*. But, to qualify under this theory, a single violation of a protected right must be a "highly predictable consequence" of a failure to train. *Id*. "The likelihood that [a] situation will recur" as well as "the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights" are factors which could justify a finding that "policymakers' decision not to train the officer reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice" *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409 (1997). "The high degree of predictability may also support an inference of causation-that the municipality's indifference led directly to the very consequence that was so predictable." *Id*. at 409-10. Here, however, the boilerplate allegations do not reveal any detail from which any such inferences could be drawn.

the entities alleged failure to reasonably accommodate Plaintiff's mental disabilities during his arrest and detention.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Discrimination includes a failure to reasonably accommodate a person's disability. 28 C.F.R. § 35.130(b)(7).

In the Ninth Circuit, Title II applies to arrests. *Sheehan v. City & County of S.F.*, 743 F.3d 1211, (9th Cir. 2014), reversed in part on other grounds by *City & County. of S.F. v. Sheehan*, 135 S.Ct. 1765 (2015). In this arrest context, two theories of Title II violations apply: (1) "wrongful arrest, where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity"; and (2) where police, in the course of investigation or arrest, "fail to reasonably accommodate the person's disability . . . causing the person to suffer greater injury or indignity in that process than other arrestees." *Id.* at 1232.

To state a claim under Title II of the ADA, a plaintiff must generally show (1) he is an individual with a disability; (2) he is otherwise qualified to participate in or receive the benefit of a public entity's services, programs, or activities; (3) he was either excluded from participation in or denied the benefits of the public entity's services, programs or activities or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits or discrimination was by reason of his disability. *Id.* Where failure to provide reasonable accommodation is alleged, the plaintiff bears the initial burden of producing evidence of the existence of a reasonable accommodation. *Id.* A public entity may defeat this claim by showing "that making the modifications would fundamentally alter the nature of the service, program, or activity." *Id.* (quoting 28 C.F.R. § 35.130(b)(7)).

### 1. ADA Claim Against the City

Plaintiff alleges the City was required to reasonably accommodate his mental illness during his

11

capture and arrest; specifically, Plaintiff alleges the arresting officers should have called a mental health specialist to "come to the scene and talk the Plaintiff down so that he could be taken into custody without having to harm him." (Cmplt., ¶ 50.) The City maintains the circumstances surrounding the pursuit and arrest of Plaintiff presented exigent circumstances that made the requested accommodation unreasonable as a matter of law.

The Ninth Circuit and several other circuit courts have held that the ADA applies to on-the-street arrests, but these courts have also held the presence of exigent circumstances informs the reasonableness of the accommodation requested. *Sheehan*, 743 F.3d at 1231-32 (holding ADA applies to arrests and that "exigent circumstances inform the reasonableness analysis under the ADA"); *see also Estate of Hunt v. Danville, VA*, 556 F.3d 171, 175-76 (4th Cir. 2009) (assuming arguendo that duty of reasonable accommodation under ADA applied in police stand-off situation, but concluding ADA did not apply in specific circumstances at issue because of exigent circumstances); *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1085 (11th Cir. 2007) (finding ADA applies to arrests but noting that the "exigent circumstances presented by criminal activity and the already onerous tasks of police on the scene go more to the reasonableness of the requested ADA modification than whether the ADA applies in the first instance"). Given the factual nature of this determination, courts typically consider ADA claims relating to arrests at the summary judgment stage when courts are better able to assess the record to determine whether exigent circumstances were present; where such exigent circumstances were present, courts have rejected ADA reasonable accommodation claims as a matter of law.

Plaintiff contends a trained therapist should have been brought to the foot pursuit so that Plaintiff could have been "talked down" rather than involuntarily subdued by force. But, Plaintiff alleges he was actively fleeing officers through a college campus between 4 and 5 am while suffering a psychotic break (Cmplt., ¶ 13), and that during the pursuit Plaintiff scaled an 11-foot fence and ran up a 40-foot embankment. As a matter of logistics, how a therapist would get close enough to Plaintiff to "talk" him "down" while he was running from capture is beyond the Court's best imagination. Plaintiff

was running from police in an erratic manner (scaling an 11-foot fence, running up a 40-foot embankment to avoid Officer McKinnon) on a college campus while suffering a "psychotic break." Taking the Complaint's allegations as true, as the Court must at this stage, the City argues the exigency is clear and the requested accommodation, under these circumstances, is patently unreasonable such that it should be determined as a matter of law at the pleading stage. *See* (Doc. 14-2, 1819-23 ("The idea that any City police officers could have slowed down this high-speed foot pursuit of a Plaintiff with superhuman abilities in order to '[have] a mental health specialist come to the scene and talk the Plaintiff down' is perhaps where the Complaint truly enters the realm of the ridiculous.").) The City argues the exigencies surrounding "a hotly contested police pursuit through a university campus of a crazed man who broke out of a mental hospital, stripped naked, and remained unfazed by multiple TASER deployments – allow the Court to determine as a matter of law that the modification suggested by Plaintiff is unreasonable." (Doc. 19:2-5.)

While the reasonableness of requested ADA accommodations may be determined as a matter of law, and exigent circumstances factor into the highly-factual assessment of what is reasonable, the City cites no cases where a court has dismissed a reasonable accommodation claim at the pleading stage due to what the Court perceives as the facial unreasonableness of the requested accommodation due to alleged circumstances characterized as exigent by the moving party. *See Sheehan,* 743 F.3d at 1232 (reversing summary judgment order and holding officer's ability to reasonably accommodate arrestee's disability could *not* be determined as a matter of law); *Seremeth v. Board of County Cmm'rs*, 673 F.3d 333, 341 (4th Cir. 2012) (affirming summary judgment order holding deaf arrestee not entitled as a matter of law to sign language interpreter during course of domestic disturbance investigation); *Bircoll*, 480 F.3d at 1084-86 (affirming summary judgment order holding deaf motorist's request for oral interpreter before taking field sobriety tests not reasonable as a matter of law).

The complaint provides very few facts about the nature of the exigency and safety concerns officers, and Officer McKinnon particularly, faced in pursuing Plaintiff such as what officers knew

about Plaintiff's then-current mental state (other than he had mental illnesses and was running from a psychiatric hold), the number of bystanders potentially involved given the early morning hours of the pursuit, how many officers were at the scene, what type of perimeter was allegedly set to surround Plaintiff, or the nature of the danger to officers or others caused by Plaintiff's exodus from the hospital to UCM's campus. At this stage of the lawsuit, the Court must be able to conclude that Plaintiff's flight from the hospital and from Officer McKinnon created an exigency that, as a matter of law, precluded the accommodation Plaintiff seeks. The City cites no sufficiently analogous case holding the circumstances pled here created an indisputable legal exigency that precluded *any* accommodation for the intervention of a mental health specialist during the pursuit and arrest of Plaintiff.

Construing the facts in the light most favorable to Plaintiff, Plaintiff alleges he was running from the hospital before police were called due to a "psychotic break," but he was not being pursued by police for any other criminal wrongdoing and there is no allegation Plaintiff knew he was evading the police or that Officer McKinnon identified himself as an officer or demanded that Plaintiff stop running. Plaintiff dropped the stick he was carrying when Officer McKinnon first began his foot pursuit of Plaintiff, and Plaintiff was not carrying any other weapon, a fact visible to others as Plaintiff was allegedly wearing only a hospital gown, and later, only his boxer shorts. Other officers allegedly had set a perimeter surrounding Plaintiff once he reached UCM's campus during the early morning hours when there were no alleged bystanders. While the requested accommodation may be deemed unreasonable as a matter of law once the safety concerns for Plaintiff, police officers, and potential bystanders is fully established, the facts of the complaint do not themselves establish the indisputable unreasonableness of the accommodation. City Defendant's motion to dismiss this claim is DENIED.

### 2.    ADA Claim Against the County

Plaintiff alleges the County failed to reasonably accommodate his mental disability when housing him in the county jail. (Cmplt., ¶ 52.) Plaintiff claims that he should have been placed in a one-person cell to ensure that he would not be "pr[e]yed upon" by other inmates. (Cmplt., ¶ 54.) The

County contends Plaintiff has failed to adequately allege a qualifying disability under the ADA and fails to allege any program or activity from which he was excluded because of his disability. Finally, the County argues Plaintiff fails to allege facts showing a nexus between the disability and the purported damages.

As noted above, to state a claim under the ADA the plaintiff must allege that he (1) is an individual with a disability; (2) he is qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) he was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or otherwise discriminated against by the public entity; and (4) such exclusion, denial, or discrimination was by reason of his disability. *McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004).

A "disability" is defined by the ADA as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A). The regulations implementing the ADA define "mental impairment" as "[a]ny mental or psychological disorder such as . . . organic brain syndrome, emotional or mental illness, and specific learning disabilities." 28 C.F.R. § 35.104. Plaintiff alleges that he has mental health disorders "including but not limited [to] schizophrenia and bipolar disorder." (Cmplt., ¶ 10.) This is sufficient at the pleading stage to allege a qualifying disability.

The County also argues Plaintiff has not alleged the activity or program from which he was excluded. Plaintiff maintains he was denied access to a public service: reasonably safe housing at the jail. The denial of public services by reason of disability is precluded by Section 12132 of the ADA. 42 U.S.C. § 12132. This allegation is facially adequate for purposes of pleading.

As to the fourth element, however, there are no facts alleged as to how Plaintiff was precluded from reasonably safe housing "by reason of" his disability. The complaint fails to make clear why Plaintiff's disability required that he be housed with no other inmate (the accommodation Plaintiff alleges should have been provided) – i.e., that the attack occurred because his mental disability made

15

him vulnerable to every single inmate with whom he might have shared a cell. Rather, the alleged attack appears to center more on placing Plaintiff, an individual small in stature, in a cell with a sexually violent offender, rather than requiring no cell mate due to his mental disability. The Court takes no position on whether Plaintiff's alleged cell assignment was lawful on other grounds:[6] For purpose of the ADA, the issue is whether the injury Plaintiff suffered (denial of safe housing and subsequent injury) was *due to* Plaintiff's mental disability. This causal link is not clearly alleged. In this regard, Plaintiff's citation to *Crowder v. Kitagawa*, 81 F.3d 1480 (9th Cir. 1996) is unhelpful. There, the Ninth Circuit held that even a facially neutral dog quarantine law required reasonable modification to prevent discrimination against visually impaired persons reliant upon service guide dogs. In that case, the link between the quarantine law and its disparate impact on visually impaired individuals was alleged: when the guide dogs of the visually impaired were quarantined upon arrival in Hawaii, those individuals were unable to negotiate public streets and transportation systems without the dogs to guide them. Here, the link between the County jail housing's policy and Plaintiff's disability resulting in unsafe housing for Plaintiff is unclear. Plaintiff must plead facts that, if believed, could support a finding that he was necessarily discriminated against by being placed with *any* cell mate due to his disability such that he would *require* a single-cell accommodation to provide him with reasonably safe housing. Plaintiff's ADA claim against the County is DISMISSED with leave to amend.

**E.    Qualified Immunity For Excessive Force Claim Against Officer McKinnon**

City Defendants argue Office McKinnon is entitled to qualified immunity for the force used in effecting Plaintiff's arrest, which included two uses of a taser deployed in dart mode, a knee kick to Plaintiff's head, and a knee kick to his chest.

Qualified immunity "shields officials from civil liability so long as their conduct 'does not

---

[6] Jail officials must provide reasonable safety for pretrial detainees. *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, ___ U.S. ___, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, [t]he contours of [a] right [are] sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (internal quotation marks and citation omitted). Courts engage in a two-pronged analysis to determine whether qualified immunity applies: "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, __ U.S. __, 138 S.Ct. 577, 589 (2018). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). If the second prong is dispositive, the court need not analysis the first. *Id.* at 236-37.

The doctrine of qualified immunity's second prong requires analysis of two discrete sub-elements: "whether the law governing the conduct at issue was clearly established" and "whether the facts as alleged could support a reasonable belief that the conduct in question conformed to the established law." *Green v. City & County. of S.F.*, 751 F.3d 1039, 1052 (9th Cir. 2014). "To be clearly established, a right must be sufficiently clear that *every* reasonable official would have understood that *what he is doing* violates that right." *Hamby v. Hammond*, 821 F.3d 1085, 1090-91 (9th Cir. 2016) (internal quotation marks and citation omitted). To overcome qualified immunity, a plaintiff "must point to prior case law that articulates a constitutional rule specific enough to alert [*this* officer] *in this case* that [*his* or *her*] *particular conduct* was unlawful. *Sharp v. City of Orange*, 871 F.3d 901, 911 (9th Cir. 2017). Although a "case directly on point" is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 136 S.Ct. at 308. Clearly established law is not to be defined with a high level of generality. *Id.* The "dispositive question is whether the

violative nature of *particular* conduct is clearly established." *Id.* (internal quotation marks and citation omitted). Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Id.*

The qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986). The Supreme Court has frequently stressed the importance of resolving immunity questions at the earliest possible stage in litigation. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

## 1.   Plaintiff's Allegations

Plaintiff was brought to Mercy Hospital and placed under a mental-health hold; Plaintiff suffered a psychotic break and left the hospital, running in the direction of UCM. (Cmplt., ¶¶ 12-14.) Officer McKinnon was dispatched to the area to capture Plaintiff, knowing Plaintiff suffered from mental illness. (*Id.*, ¶ 15.) Plaintiff was not pursued for any suspected crime, but for community policing purposes.

During his flight, Plaintiff was wearing a yellow hospital gown and carrying a four-foot wooden post. (*Id.*, ¶ 16.) Upon observing Plaintiff, Officer McKinnon got out of his patrol car and began a foot chase of Plaintiff. (*Id.*, ¶ 17.) Plaintiff threw down the wooden post, continued to run, scaling an 11-foot fence entering the stadium section of UCM's campus. (*Id.*) At this time, other officers had arrived at the location and set a perimeter so that Plaintiff would not be able to escape. (*Id.*) Officer McKinnon followed Plaintiff and, while illuminating Plaintiff with a flashlight, observed Plaintiff doing summersaults down an embankment wearing only boxer shorts. (*Id.*, ¶¶ 19-20.) Subsequently, Plaintiff laid down on a path, but when Officer McKinnon caught up to him, Plaintiff jumped up and began running up a 40-foot embankment. (*Id.*, ¶¶ 21-22.) At this time, Officer McKinnon deployed his taser in dart mode, causing Plaintiff to fall to the ground and hit his head. (*Id.*, ¶ 22.) Plaintiff then got up and began running again, but became fatigued and stopped running; when Officer McKinnon caught

up with him, McKinnon again deployed the taser in dart mode and shot Plaintiff in the chest, causing Plaintiff to fall to the ground. (*Id*., ¶ 23.) Plaintiff pulled out the dart barbs, and observed Officer McKinnon approaching him again, apparently to tase him a third time in drive-stun mode. (*Id*., ¶ 24.) Plaintiff attempted to push Officer McKinnon's hand away to avoid being harmed (*Id*., ¶ 25), and Officer McKinnon then executed a knee strike to Plaintiff's head, which knocked Plaintiff down a hill (*Id.*). McKinnon pursued Plaintiff down the hill and executed another knee strike to Plaintiff's rib-cage area. (*Id*., ¶ 26.) At the bottom of the hill, Plaintiff was apprehended by other police officers and taken to the county jail. (*Id*, ¶ 27.)

### 2. Plaintiff Sufficiently Alleges Violation of Fourth Amendment Rights During Arrest

The first of the two prongs of the qualified immunity analysis considers whether there was a violation of the plaintiff's constitutional rights – here, whether the force used to arrest Plaintiff was excessive under the Fourth Amendment. To determine whether a use of force was reasonable under the circumstances presented, a court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interest at stake." *Graham*, 490 U.S. at 397. Determinations of reasonableness must account for the fact that "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

#### a. Nature and Quality of Intrusion

Claims of excessive force are analyzed under an objective reasonableness standard. *Scott v. Harris*, 550 U.S. 372, 381 (2007). Determining whether a Fourth Amendment violation has occurred requires a "careful balancing" of the extent of the intrusion on the individual's Fourth Amendment rights against the government's interests to determine whether the officer's conduct was objectively reasonable based on the totality of the circumstances. *Graham*, 490 U.S. 396-97.

The use of force employed here included the deployment of a taser in dart mode twice without

warning and two knee strikes: one to Plaintiff's head and the other to his chest.

It is well-established that the use of tasers – especially those in dart mode – though falling into the category of non-lethal force, is considered an intermediate or medium quantum of force. *Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010). Knee strikes to the head or spine are also considered a significant, intermediate use of force. *Blankenhorn v. City of Orange*, 485 F.3d 463, 480 (9th Cir. 2007) (impact blows by punching or kicking are considered significant or intermediate force capable of inflicting significant pain and causing serious injury); *Jones v. County of San Bernadino*, No. 15-cv-00080-DTB, 2016 WL 4425711, at *9 (C.D. Cal. 2016) (concluding multiple knee strikes delivered to the head or base of the neck of a passively resisting pretrial detainee constituted excessive force, which was clearly established by 2012); *Lopez v. City of Imperial*, No. 13-cv-00597-BAS (WVG), 2015 WL 4077635, at * 7 (S.D. Cal. July 2, 2015); *Aranda v. City of McMinnville*, 942 F. Supp. 2d 1096, 1105 (D. Or. 2013) (using closed fist and knee to deliver multiple focused blows to the plaintiff's head, shoulder, and side a significant use of force).

b. **Governmental Interest**

In considering the reasonableness of the force used, courts must balance the use of force against the need for that force – i.e., the governmental interest in applying force. The government's interest in the use of force is evaluated by examining three core factors: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396; *Bryan*, 630 F.3d at 826. In assessing the governmental interests involved in subduing a mentally ill individual who is unarmed, the Ninth Circuit has offered this general guidance:

> As we have held, "[t]he problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense." *Deorle*, 272 F.3d at 1282-83. Although we have refused to create two tracks of

20

excessive force analysis, one for the mentally ill and one for serious criminals, we have found that even "when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted . . . with a mentally ill individual. *Id*. at 1283. The same reasoning applies to intermediate levels of force. A mentally ill individual is in need of a doctor, not a jail cell, and in the usual case – where such an individual is neither a threat to himself nor to anyone else – the government's interest in deploying force to detain him is not as substantial as its interest in deploying that force to apprehend a dangerous criminal. Moreover, the purpose of detaining a mentally ill individual is not to punish him, but to help him. The government has an important interest in providing assistance to a person in need of psychiatric care; thus, the use of force that may be justified by that interest necessarily differs both in degree and in kind from the use of force that would be justified against a person who has committed a crime or who poses a threat to the community.

*Bryan*, at 829.

In considering the first factor, the severity of the crime at issue, the facts weigh against the use of significant, intermediate-level force. *See Bryan*, 630 F.3d at 829 (reasoning this factor weighs in favor of plaintiff where crime was a misdemeanor that is not inherently dangerous or violent). Plaintiff was not being pursued for breaking the law – he was being pursued by police because he had left the hospital where he was detained on a mental-health hold; Plaintiff was not a dangerous criminal and had not recently committed a serious offense. Although Plaintiff had been carrying a 4-foot stick when he was spotted by Officer McKinnon, he dropped the stick, and was wearing only boxer shorts after he discarded his hospital gown; based on the allegations, Plaintiff was clearly unarmed at the time Officer McKinnon first employed the taser in dart mode.

As to whether Plaintiff posed an immediate threat to officers or others, Plaintiff did not have a weapon. Although Plaintiff alleges he was fleeing from Officer McKinnon on a college campus, it was approximately 4:30 a.m. when the chase began and there is no indication from the complaint there were students or bystanders that Plaintiff would have encountered while fleeing. Also, Plaintiff alleges other officers had set up a perimeter, which ensured that he would not have escaped from Officer McKinnon. (Cmplt., ¶ 18.) These alleged circumstances do not indicate Plaintiff posed any immediate threat to officers or others. *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001) ("a desire to resolve

quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury. There must be other significant circumstances that warrant the use of such a degree of force at the time it is used.").

The third factor considers whether there was active resistance or an attempt to evade arrest. Plaintiff was fleeing and refused to stop for Officer McKinnon. Although Plaintiff characterizes this as "passive resistance," "[r]esistence" is not "a binary state"; it is better understood as a spectrum "from purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer." *Bryan*, 630 F.3d at 830. Fleeing and hiding from the police constitutes resisting arrest in the *Graham* context. *Chew v. Gates*, 27 F.3d 1432, 1442 (9th Cir. 1994). Plaintiff's allegations indicate he was already running toward the campus before Officer McKinnon began chasing him, but Plaintiff still refused to stop running from Officer McKinnon.[7] This is something more than mere passive resistance. Plaintiff's flight from Officer McKinnon presents a stronger governmental interest in the use of force. In sum, however, this is the only factor weighing in favor of the use of force. Plaintiff was not suspected of any criminal behavior, there are no allegations that he threatened Officer McKinnon, that there were bystanders or officers potentially in danger, and Plaintiff alleges other officers had already created a perimeter to ensure Plaintiff could not get away.

Accepting Plaintiff's allegations as true and drawing all reasonable inferences in Plaintiff's favor, Plaintiff has adequately set forth a claim for excessive force during his arrest. As alleged, the significant use of force in deployment of the taser darts, one dart being deployed after Plaintiff had stopped running, and knee kicking Plaintiff at a time when he was already on the ground (knee kick to the head) and was not resisting (knee kick to the chest while Plaintiff was knocked down from the knee kick to his head and rolling toward the bottom of a hill) did not support the governmental interests in the level of force used by Officer McKinnon.

---

[7] There is no allegation that Officer McKinnon identified himself to Plaintiff as an officer or demanded that Plaintiff stop running.

### 3. **Case Law Clearly Established Conduct Violated the Law**

Whether the alleged conduct adequately states a claim for excessive force, however, is not dispositive to the qualified immunity analysis. The second prong of the qualified immunity analysis considers whether the allegedly excessive use of force constitutes a violation that was clearly prohibited by law at the time events occurred.

By June 2014, when the events here occurred, case law had clearly established the nature of the force employed by Officer McKinnon (dart taser and knee kicks to the Plaintiff's head and chest) was significant. *Bryan*, 630 F.3d at 825; *Blankenhorn*, 485 F.3d at 480 (impact blows by punching or kicking are considered significant or intermediate force capable of inflicting significant pain and causing serious injury). Force deemed to be intermediate or significant when employed against an unarmed, non-resisting, mentally ill individual, has been found excessive. *Deorle*, 272 F.3d at 1282. In *Deorle*, officers were dispatched to the home of an individual who was behaving erratically after consuming prescription medication and alcohol. An officer, trained in the deployment of force against recalcitrant suspects, arrived at the scene and observed Deorle who was carrying an unloaded plastic crossbow in one hand, and a can or bottle of lighter fluid in the other. The officer shouted for Deorle to put down the crossbow and Deorle discarded it. The officer then stationed himself in a garden adjacent to Deorle's house waiting until Deorle, who was walking on his property, reached a predetermined point and then fired a stun-beanbag gun. The officer did not warn Deorle that he was going to shoot, did not ask him to drop the bottle, nor order him to halt.

There are only some differences between the allegations regarding the force used here and those in *Deorle*. Plaintiff was fleeing from Officer McKinnon in a public area (where the risk to others was potentially greater), he was not on his own property as the individual in *Deorle*. But, that is where the substantial differences between the two cases end. Both Plaintiff and Deorle were not suspected of any violent crimes; although both were displaying erratic behavior, neither was armed at the time force was deployed, and neither was warned before force was used. Plaintiff, like Deorle, was not threatening

officers at the time the first taser dart was deployed; he was running from Officer McKinnon, but he had been running at the time Officer McKinnon had first observed him. When the second dart was deployed, Plaintiff had allegedly stopped running and was not warned of a second shot. (Cmplt., ¶ 23.) There are no facts indicating any bystanders were present, and Plaintiff alleges other officers had already set a perimeter surrounding Plaintiff at the time Officer McKinnon first deployed his stun gun in dart mode. Additionally, at the time Officer McKinnon allegedly administered the final knee kick to Plaintiff's chest, Plaintiff was on the ground, no longer running, and was not resisting in any manner. (Cmplt., ¶ 26.) It was clearly established by 2014 that application of intermediate, significant force to apprehend a mentally ill individual not suspected of any serious crime is excessive where the force was applied at a time when the suspect was offering no resistance and was facing away from the officer (as when Officer McKinnon allegedly knee-kicked Plaintiff in the chest while he was on the ground, no longer running). *Bryan*, 630 F.3d at 832 (as of 2010, clearly established law held that significant use of force to arrest non-resisting individual without any warning was excessive). Accepting the facts as alleged, construing all reasonable inferences in Plaintiff's favor, and with no additional allegations or facts detailing the exigency Officer McKinnon faced in arresting Plaintiff, the Court cannot conclude at this stage that qualified immunity applies to the use of force administered by Officer McKinnon in arresting Plaintiff.

## IV. <u>CONCLUSION AND ORDER</u>

For the reasons set forth above, IT IS HEREBY ORDERED that:

**1.** City and County Defendants' Motions to Dismiss are GRANTED as follows:

    a. Plaintiff's Monell claim and ADA claim against the County are dismissed without prejudice and with leave to amend;

    b. Plaintiff's Monell claim against the City is dismissed without prejudice and with leave to amend;

**2.** Defendants' Motions to Dismiss are DENIED as follows:

    a. City and County Defendants' Motions to Dismiss the Complaint as Barred by the

Statute of Limitations is DENIED without prejudice;

      b.      City Defendants' Motion to Dismiss Plaintiff's ADA Claim is DENIED;

      c.      City Defendants' Motion for Qualified Immunity is DENIED without prejudice;

**3.**      Plaintiff shall file an amended complaint within 14 days from the date of this order; if Plaintiff fails to file an amended complaint, the case will proceed only on the claims found cognizable. Should Plaintiff choose to amend, he should be aware that a great deal of time was spent providing this substantive order. Ignoring any portion of it in amending will result in no further opportunities to re-amend.

IT IS SO ORDERED.

Dated:    **November 7, 2018**                    **/s/ Lawrence J. O'Neill**     
                                           UNITED STATES CHIEF DISTRICT JUDGE